JUDGE DAVID GUADERRAMA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

FILED
2021 SEP 23  PM 3: 37
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| $282,877.00, MORE OR LESS, IN | § | |
| UNITED STATES CURRENCY, | § | **EP21CV0229** |
| | § | |
| RESPONDENT. | § | |

**APPENDIX A, FACTS IN SUPPORT OF VERIFIED COMPLAINT FOR FORFIETURE**

1.      On May 11, 2021, Isha Monic Padilla (Padilla) and her husband Angel de Jesus

Benavidez (Benavidez) entered El Paso, Texas from Mexico via the Ysleta Port of Entry. Upon

entry, Padilla declared $282,877 in U.S. currency. Padilla arrived at the Ysleta Port of Entry with

a Currency and Monetary Instruments Report (CMIR), Parts I and II pre-filled digitally, indicating

that she, Isha Monic PADILLA (DOB: 2/28/89), a United States citizen, living at 765 Jonespoint

in El Paso, Texas, was importing the USC on behalf of her business, Alltech Smartphone

Distributors located at 193 N. Zaragoza, Ste. A in El Paso, Texas, and the type of business activity

was with Navy Federal Bank, Smartphone Distributors.  Parts III and IV of the CMIR were filled

in with pen, indicating that she was importing $282,877 in U.S. currency on May 11, 2021, with

her name and signature.

2.      Since January 4, 2021, Homeland Security Investigations (HSI) has been

investigating Padilla for her potential involvement in money laundering based on their

observations that from January 1, 2020, through May 11, 2021, she has entered El Paso claiming

large amounts of currency received from selling cellular telephones in Mexico. When Padilla

declared the currency on May 11th, CBP officers (CBPO) contacted and notified HSI Special

APPENDIX A

Agent (SA) Brandon Broussard of the above facts.  HSI SAs Brandon Broussard and David Aldana

responded to the Ysleta Port of Entry to interview Padilla and Benavidez.

3.      During the interview, Padilla described a somewhat convoluted system in which

she operates her business, Alltech Smartphone Distributors located at 193 N. Zaragoza, Ste. A in

El Paso, Texas, (Alltech) stating that she bids on cell phones, and if she "wins" the bid, she then

sells the cellphones in Mexico. Padilla and Benavidez indicated that in addition to buying phones

wholesale and selling them in Mexico, Padilla transports money for a client identified as Omar

Alvillar (Alvillar) in order to help him purchase cell phones. Specifically, Padilla picks up money

from Alvillar in Mexico, takes the money to the United States, deposits it in her business bank

account, then makes payments on behalf of Alvillar. In exchange for this service, Alvillar pays her

2% of the currency she transports. Of the money she was crossing with on May 11, 2021, Padilla

stated that approximately $123,572 belonged to Alvillar.

4.      Padilla stated that for Alvillar's phone orders she only makes two percent of the

total cost on his orders.  Padilla stated that she also takes two percent from other customers' orders.

Two of these customers were identified as Eric Guillen and Robert Fierro.  Padilla said that she

does this for them because they have helped her out a lot, especially when things got hard during

the COVID-19 pandemic. Padilla said that she, Alvillar, Eric, and Robert ordered from Trillion, a

cellphone provider that gives lists of phones and prices. Padilla stated that Trillion is her Apple

iPhone provider.  Padilla said that she makes payments for them because it is easier if they go

through her.

5.      Padilla stated that Alvillar had business accounts at the Bank of America, but they

kept shutting his accounts down, so he asked her to make the payments for him and she could take

two percent from the order's cost as payment. Padilla stated that banks require customers to be a

APPENDIX A                                    2

U.S. citizen to open a business account as the reason Alvillar's accounts were closed and that he has lost money when using them to wire money. However, Padilla had no explanation for why Alvillar was going through her if he has a business in El Paso. Padilla stated that she did not know if Alvillar had a business in El Paso, Texas. SA Broussard pointed out that the shipping address on the invoice she showed agents was to a business named Sotelo's Cells with an address in El Paso, Texas. Padilla said she knew he had a business in Mexico and that Sotelo's Cells was his uncle's business. She explained that she simply picks up the money, deposits the money in her account and makes payment for Alvillar.

6.      Padilla first met Alvillar in or about the year 2011, also about the time she first started selling phones and accessories at the "swap meet" near Ascarate Park in El Paso. Initially, Alvillar would purchase a few phones from her, and he would come around every other weekend. Padilla said it was a couple of months before she saw him again, and the next time she saw him is when he approached her about making payments for him for a percentage of the cost. He told her that he wanted to do business with her, and he started buying a couple of phones. She told him that she wanted to look into it before she would accept. Padilla stated that Alvillar first approached her about making payments for him around December of 2018, which was about the time she started buying phones from "B-Stock", an international auction site for phones and electronics. Padilla explained that B-Stock acquires used phones from most of the mainstream cell providers (T-Mobile, Verizon, etc.). Padilla said that she places bids for phones through places like B-Stock and if she wins the bid, then she pays for the phones, and they ship them to her.

7.      Padilla stated that she did not know if Alvillar had a B-stock account until she started making the payments for him. Padilla said that she asked at the business classes given at the tax office downtown to make sure she could take the percentage because she did not want to

do anything wrong. She was told she could take two percent as long as she has the order invoice, her tax ID, and his Mexican tax ID documented. Padilla said that after she was told that she could accept at most two percent, she and Alvillar met again, but this time at her store. She initially told him she would do it for three percent and he told her that was too much. Padilla stated that she told him no at that time, but that he came back in either September or August of 2020 and asked her again. This time, she told him that she would do it for no less than two percent. Padilla said after Alvillar accepted the two percent, she started making the payments for him. Padilla said that the whole arrangement was for her to make payments for the orders and Alvillar would deal with the shipping costs and deliveries.

8.      Padilla more specifically described her arrangement with Alvillar as follows: she picks up the money from him in Mexico and crosses it into the U.S., deposits the money in her business account, and then makes the payment for him. Alvillar ordered and arranged to deliver his own products then provided her with the invoice, the money for that invoice, and the two percent for making the payment for him. She never received the phones and Alvillar always gave her the money to pay for the orders.

9.      Padilla admitted to SA Broussard that she was not a licensed money courier. She also admitted that the money she picks up from Alvillar is not hers, other than the two percent but stated that the money she picked up from her other customers was her money. Padilla said she only started crossing to pick up money from her customers in Mexico when the bridges were shut down due to COVID-19.

10.     Padilla did not know whether Alvillar is involved with any other type of business outside of selling phones and further stated that she has had no personal interaction with him, that her husband does most of the communicating with him and he receives all the invoices from him.

Padilla stated her husband wouldn't go pick up the money and cross it through himself because it was her business and that she had been told by one of the deputies when they crossed one time that she was the only person that could cross the money. She is the only name listed for the business.

11.     SA Broussard paused Padilla's interview to advise her of the Miranda rights in English as witnessed by SA Aldana. Padilla acknowledged and waived her rights and was willing to continue speaking with SAs without the presence of an attorney. SAs advised Padilla that the concern was that she was acting as a money courier for Alvillar, and that a money courier must be licensed and has the responsibility to declare that money on behalf of the owner of that money when crossing with that individual's money. Here, it was Alvillar who had her cross the money without ever declaring it on his behalf. Padilla replied that she never saw it that way, and that she engaged in this activity because she was able to make some extra money and did it for that reason alone. Padilla stated that she would provide all the information she has about Alvillar.

12.     Padilla stated the currency she declared on May 11, 2021 came from five different people. Of these people, she stated that Omar Alvillar, Erik Guillen, and Robert Fierro each pay her a two percent commission for the purchase of cell phones. Padilla informed the agents that she marked each bundle of currency with the amount contained and from whom it belonged. She also stated that any bundles of currency that were not marked were from Alvillar and that these were in the amount of $10,000 each. At that time, SAs along with Padilla, looked through the currency, bundle by bundle, to identify the amount of money belonging to each person. There were 21 bundles of currency in total.

13.     During the process of looking through the bundles of currency, Padilla could not provide last names for the individuals. Their full names were gathered from Alltech's business paperwork. The bundle of currency that belonged to Benavidez was cash from his wallet. The

following list is of each bundle of currency with amount and name as Padilla marked them:

| | |
|---|---|
| Jorge Omar ALVILLAR Rosales- | $13,709 |
| | $10,000 |
| | $10,000 |
| | $2,500 |
| | $10,000 |
| | $4,863 |
| | $2,500 |
| | $10,000 |
| | $10,000 |
| | $10,000 |
| | $10,000 |
| | $10,000 |
| | $10,000 |
| | $10,000 |
| **Total:** | **$123,572** |
| | |
| Erik Samuel GUILLEN Reyna- | $8,140 |
| | $50,000 |
| **Total:** | **$58,140** |
| | |
| Martin CRUCES Bolivar **Total:** | **$9,000** |
| | |
| Robert Michael FIERRO- | $32,240 |
| | $50,000 |
| **Total:** | **$82,240** |

Eduardo Last Name Unknown **Total: $2,775**

Angel De Jesus BENAVIDEZ **Total: $750**

14.     While SAs looked through the bundles of currency with Padilla, SAs did not physically count any of the currency. Each bundle of currency was labeled by Padilla with a sticky note indicating the amount held within it. The list above accounts only for a total of $276,477, which is $6,400 less than the total amount declared.  Agents have not determined the ownership of this $6,400, but it is believed to represent the two percent commission for the orders in addition to shipping charges. A two percent commission on the amount of $276,477 is $5,530.  In addition, Padilla stated she sometimes paid for next day shipping through FedEx, which she estimated at

$900. When agents added the amounts of $5,530 and $900 to $276,477, the total equaled $282,907, which was nearly the total amount Padilla declared, $282,877.

**BENAVIDEZ'S INTERVIEW**

15.     On May 11, 2021, SAs Broussard and Aldana interviewed Benavidez who stated that he handled all the purchase orders for the business, to include the Mexico orders. Benavidez admitted that he and Padilla receive commissions from about four or five customers, whose names he gave as Omar (Alvillar), Robert, Juan Luis Escalera, and Joel. He stated that Escalera and Eric Guillen are partners, and that Robert is basically the same as Omar, that they work together, and their phones are shipped directly to them at the same address.

16.     Benavidez explained that they began receiving commissions from Alvillar who came to him before they closed all the bridges and told him that Alvillar would pay them a commission. Benavidez further stated that all of the clients who pay them a commission have their phones shipped directly to them. Benavidez advised that the clients make their own orders, and he is like a broker and acts as their payment service.

**SOTELO'S INTERVIEW**

17.     SA Broussard and CBPOs Sergio Becerra and Jose Galindo interviewed Osvaldo Sotelo Bastida at the Bridge of the America's Port of Entry in El Paso, Texas. Sotelo stated that he knows Padilla and Benavidez because they work at Alltech, where his brother, Oscar Sotelo, buys cell phones for his cell phone business in Mexico. Sotelo stated that the phones come from a company called Trillion. The phones are picked up from Alltech and then taken to his address at 6295 Los Bancos in El Paso, Texas, where he, his dad, his sister, and her husband all live.

### OMAR ALVILLAR'S INTERVIEW

18.     On July 14, 2021, HSI SA Rivas contacted Jorge Omar Alvillar Rosales via telephone and explained that SAs would like to interview him regarding his business and some currency that was seized at the Ysleta Port of Entry (POE) on May 11, 2021. Alvillar stated he knew that this was about his money, approximately $130,000.

19.     On July 16, 2021, HSI SAs Brandon Broussard and Lee Rivas conducted an interview of Alvillar at the Ysleta POE in El Paso, Texas.  SA Rivas read Alvillar the Miranda rights in the Spanish language witnessed by SA Broussard.  Alvillar acknowledged and waived his rights and was willing to speak with SAs without the presence of an attorney.  Alvillar gave the name of his business as Good Cell, located at Calle Hiedra 6513 in Juarez, Mexico, and stated that he has been working for approximately 8 years, but only formally for 6 years.  Alvillar stated that he has been working with Benavidez for approximately one year and four months, since the POEs closed, because working with Benavidez gave him better deals than through eBay where the phones were more expensive.

20.     Alvillar stated that he first met Benavidez on November 20, 2019, when he went to a technology conference in Los Angeles, California.  He stated that all the biggest cell phone providers went to that conference.  Alvillar also stated that the larger providers don't use PayPal and will only accept wire transfers.  In order to get a good price, Alvillar stated that customers must spend at least $10,000-$20,000.  Alvillar stated that he couldn't get that kind of money. When SAs noted that he has provided Padilla and Benavidez over $100,000, he stated that he had that kind of money, but he did not have a way to conduct business without a business account. Alvillar stated that he cannot open a business account through the U.S. banks because he is not a U.S. citizen, and that is what Wells Fargo and Bank of America told him. Alvillar has not attempted to open a business account with any other banks. He did acknowledge that he does have a business

bank account in Mexico, but he does not wire payments to Trillion from that account, although it would save on the commission to Alltech, because he does not want to pay the conversion fee from pesos to dollars.

21.     Alvillar explained his business dealings with Alltech. Alvillar stated that he personally contacts Trillion to place a purchase order from the list of phones and prices that Trillion provides through a WhatsApp group text message with Alvillar and Benavidez.  Trillion sends the proper invoice to both Alvillar and Benavidez.  Alvillar gives Trillion the address where he wants the cell phones to be shipped, but he never ships to Alltech; instead, Alvillar has the phones shipped to 6295 Los Bancos in El Paso, Texas, the residential address belonging to his friend, Juan Jesus Sotelo. Alvillar knows Juan Sotelo because he resells cell phones as well and from approximately 8 years ago, Sotelo's brother, Oscar Sotelo, supplied Alvillar with cell phones.  He stated that Padilla gets the money for the cell phones in Mexico, brings the money into the United States, deposits the money into her business bank account, and then wire transfers the funds to Trillion to pay Alvillar's current invoice.  Alvillar stated that eighty percent of his purchases are from Trillion. Alvillar stated he has been working with Trillion for approximately one year and five months, since the POEs closed.

22.     Alvillar stated $129,675 of the seized currency belonged to him but that a small portion of that was his brother's.  He was unable to give an amount for the commission or profit going to Alltech. He denied paying two percent of the total and instead stated that it was between $4-$7 per cell phone. He could not tell agents how much Benavidez made in profit on this current order, nor could he provide any paperwork for the cell phone order.  He did not have an invoice or receipt or any text messages regarding the order.  However, Alvillar did acknowledge that the only service that Alltech provides is they pick up his money, bring it across the border, deposit into

their account and wire the money to Trillion. He orders cell phones directly through Trillion,

Trillion provides him the invoice, Trillion ships the cell phones directly to the address of his choice,

and Alltech does not place the phone order, does not provide the invoice, and never touches the

cell phones.  SAs pointed out to Alvillar that he is only using Alltech as a money courier to avoid

reporting requirements in his name at the POE and the bank. Alvillar backpedaled and stated that

Alltech is his provider. SAs also advised Alvillar that it appears that the seized currency actually

belongs to him and that he can petition for its return. Alvillar replied that Alltech is his provider

and that he gave them the money for the cell phones and that he just wants his cell phones.  Alvillar

then stated that the money is not his, that he is not petitioning for it, and that he relinquished his

rights to the money.

## HSI INVESTIGATION

23.     Investigators located CMIRs and other records showing the transportation of U.S.

currency by Padilla into the United States and deposits into her U.S. bank account. The pattern in

which Padilla brings U.S. currency into the United States on behalf of clients in Mexico, deposits

the U.S. currency into her U.S. bank account and conducts financial transactions on their behalf,

(as in the case of the payments wired to Trillion on behalf Alvillar), suggests that Padilla is

operating an unlicensed money transmitting business in violation of Title 18 U.S.C. § 1960. [1]

---

[1] Title 18 U.S.C. § 1960(b)(1) defines the term "unlicensed money transmitting business", in pertinent part as follows: a money transmitting business which affects interstate or foreign commerce in any manner or degree, and is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; fails to comply with the money transmitting business registration requirements under section 5330 of Title 31, United States Code . . .

Title 31 C.F.R. 1010.100(ff)(5)(i)(A)- Defines a money transmitter as a person that provides money transmission services.  The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.  "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or any other person engaged in the transfer of funds.

24.     In the interview with investigators, Padilla stated that she did not have a license in the U.S. to operate a money transmitting business. Investigators verified that Padilla was not registered with the Financial Crimes Enforcement Network (FINCEN), the agency within the Department of the Treasury which provides a government-wide financial intelligence and analysis network from multiple sources and which administers the registration requirements set forth in Title 31 U.S.C. § 5330. Investigators have done a thorough search of the FINCEN network and concluded that there are no records/licenses in the name of Padilla or her business, Alltech Smartphone Distributors.

25.     Furthermore, investigators have searched the Texas Department of Banking official files, and found no record of an application for, nor of a current license for, Padilla or her business, Alltech Smartphone Distributors.

26.     Alvillar, Guillen, Cruces and Fierro use Padilla through her business, Alltech, as a money courier by using her to transport currency from Mexico to the U.S., avoiding their names being filed on the CMIR and using her business bank account to deposit large amounts of currency to satisfy wire transactions to U.S. based businesses, also avoiding their names being filed on a Currency Transaction Report (CTR).  Alvillar began using Padilla and her business to transport currency and make deposits and transactions on his behalf after he had multiple personal bank accounts closed, and after not being able to open a business bank account due to him not being a U.S. citizen.

27.     Interviews with Padilla, Benavidez, and Alvillar make clear that the only service Alltech provided for multiple subjects, or so-called "customers", was that of a money transaction/money courier service. Specifically, Alvillar placed his orders directly with businesses, such as Trillion.  Trillion would provide the invoice for the order to Alvillar, who then provided

the invoice to Benavidez.  At that time, Padilla would go to Mexico to pick up the money from Alvillar to fulfill the invoice along with the two percent commission.  Padilla would transport the money through the Ysleta POE, declaring the money with CBP, in her name, for her company Alltech, and deposit the money into her business account with Navy Federal Credit Union and wire the money to Trillion to satisfy the invoice for Alvillar's order. Trillion would then ship the phones to 6295 Los Bancos, in El Paso, Texas, a residential address that Alvillar provided to Trillion, where at some point thereafter the cell phones would be exported to Mexico for Alvillar without filing the proper exportation paperwork with CBP.[2]  Padilla, through Alltech or through Benavidez, would never in any capacity, place the cell phone order, receive or transport the cell phones, would not verify serial numbers, or verify that the product delivered was accurate compared to the invoice, nor verify or guarantee that Alvillar received the shipment.

28.    Additionally, on May 11, 2021, Padilla filed a CMIR to declare the transportation of $282,877 in U.S. currency. This CMIR contained a material omission, in violation of 31 U.S.C. §§ 5324 and 5316. In Part II (Information about person(s) or business on whose behalf importation or exportation was conducted) of the CMIR, PADILLA stated she was transporting the currency on behalf of Alltech Smartphones Distributors, when she was in fact transporting the currency on behalf of Alvillar, Guillen, Cruces and Fierro.[3]

---

[2] Padilla, Alvillar, and Sotelo admitted to SAs that they have, on multiple occasions, taken cell phones from the U.S. into Mexico for resale and have not reported the exportation of those cell phones to CBP, either electronically or verbally at the POE.

[3] Title 31 U.S.C. 5316 and 31 C.F.R. 1010.340 create an obligation to report the transporting of monetary instruments totaling more than $10,000 at one time into or out of the United States. CMIRs are completed by individuals when "transporting" monetary instruments.

Title 31 U.S.C 5316(b)(3)- A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes. The report shall contain the following information to the extent the Secretary prescribes: when the monetary instruments are not legally and beneficially owned by the person transporting the instruments, or if the

29.     Agents learned through the investigation that Padilla has imported and declared approximately $6,583,480 in U.S. currency, through 109 CMIRs, at various POEs throughout El Paso, Texas during a 17-month period from January 1, 2020, through May 11, 2021.  A review of records received from Navy Federal Credit Union revealed that during that same time period, Padilla has made approximately 333 cash deposits totaling $9,284,995 into her Navy Federal Credit Union business account and sent approximately 307 wire transfers totaling $10,119,930. Of the 307 wire transfers from Padilla's Navy Federal Credit Union account, 105 were wire transfers to Trillion, and of these 105, at least 72 wire transfers to Trillion were on behalf of others, including Alvillar, Guillen, and Cruces.

## CONCLUSION

30.     The evidence described herein suggests a pattern in which Padilla brings U.S. currency into the U.S. on behalf of Alvillar and other clients in Mexico and conducts financial transactions on their behalf.  The transportation and declaration of this currency, regardless of the source of the client's U.S. currency, is done to avoid payment of government-imposed taxes by the Republic of Mexico, to avoid currency exchange fees and importation fees, while also avoiding the clients' names being reported to the FINCEN through CMIRs and CTRs.

31.     Therefore, considering in totality the described facts and circumstances, including Padilla's admission that $123,572 of the currency belonged to Alvillar, and that she was transporting it for him; the remaining currency was also being transported for others; Padilla's bank account showing numerous large cash deposits and disbursements on behalf of third parties;

---

person transporting the instruments personally is not going to use them, the identity of the person that gave the instruments to the person transporting them, the identity of the person who is to receive them, or both.

Title 31 U.S.C. 5324(c) makes it a crime to fail to file a report required by 31 U.S.C. 5316, file a report containing a material omission or misstatement, or structure any importation or exportation of monetary instruments.

and her lack of registration with FINCEN and/or the State of Texas, the Respondent Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C) for violations of 18 U.S.C. § 1960(b)(1)(A) and (b)(1)(B); and pursuant to 31 U.S.C. § 5317(c)(2)(A) for violations of 31 U.S.C. §§ 5316 and 5324.